## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:20-CR-00157 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DWAYNE W. SHERMAN | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

This is a criminal case in which Defendant Dwayne Sherman ("Sherman") was charged in an eight-count second superseding indictment with six counts of money laundering, one count of drug trafficking conspiracy, and one count of money laundering conspiracy. (Doc. 116.) On July 12, 2022, following a five-day jury trial, the jury found Sherman guilty on all counts. (Doc. 145.) The case is presently before the court on Sherman's motion for a new trial on the basis of insufficiency of evidence and alternatively that the weight of the evidence was against the jury's verdict. (Doc. 149.) Because the court concludes that sufficient evidence supports the jury's verdict and that the verdict was not against the weight of the evidence, the court will deny the motion. However, because the court concludes that the pairs of substantive money laundering counts constitute separate means of committing a single offense, the court will vacate Sherman's convictions at Counts 2, 4, and 6.

## PROCEDURAL HISTORY

Sherman was charged with six counts of money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i) and § 1956(a)(2)(B)(ii), by indictment on July 1, 2020.  (Doc. 1.)  On December 1, 2021, Sherman was additionally charged with drug trafficking conspiracy in violation of 21 U.S.C. § 846 and money laundering conspiracy in violation of 18 U.S.C. § 1956(h) by superseding indictment.  (Doc. 50.)  On August 24, 2022, a second superseding indictment was returned, containing the same charges, but amending the time frame and location for some of the counts.  (Doc. 116.)

The court resolved several motions prior to trial.  On April 18, 2022, following a hearing, the court denied Sherman's motion to suppress evidence.  (Doc. 78.)  On June 15, 2022, the court denied Sherman's motion to dismiss or transfer count 7 of the superseding indictment due to improper venue.  (Doc. 87.)  Sherman then filed a motion for reconsideration of the court's order denying his motion to dismiss or transfer, which the court denied on July 18, 2022.  (Doc. 97.)

On September 12, 2022, following a five-day jury trial, the jury found Sherman guilty on all counts.  Sherman then filed the instant motion for new trial on September 26, 2022, along with a brief in support.  (Docs. 149, 150.)  The Government timely filed a brief in opposition on October 25, 2022.  (Doc. 153.)  Sherman filed a reply brief on November 8, 2022.  (Doc. 156.)  The court ordered

2

supplemental briefing on June 12, 2023, which order was amended on June 15,

2023.  (Docs. 174, 176.)  The Government and Sherman timely filed their

supplemental briefs.  (Docs. 180, 181.)  Therefore, the motion is ripe for

resolution.

## FACTUAL BACKGROUND

The trial evidence established that law enforcement was conducting an

investigation into a drug trafficking organization ("DTO") that was laundering

money for cartels in Mexico.  The information law enforcement received turned

their focus to a specific money exchange house ("casa de cambio") that was

receiving large amounts of cash.  Officials developed and utilized two confidential

human sources[1] ("CHS") to assist in the instant investigation.  These confidential

human sources infiltrated the Beltran DTO.

Testimony at trial also established that law enforcement received

information through the confidential human sources that one of their targets in

Mexico wanted assistance picking up money in Lancaster or Harrisburg,

Pennsylvania.  An approximate amount, a phone number, and a code phrase were

provided to facilitate the cash transfer.  CHS 2 called the phone number, utilized

the code phrase "on behalf of your brother," and coordinated the cash pickup from

---

[1] A confidential human source ("CHS") is an individual who is embedded in a criminal
organization and provides information and intelligence to law enforcement.  During the trial,
CHS 2 testified under the alias Ruben Martin.

the then-unidentified individual.  The phone number belonged to Dwayne

Sherman, and he answered the call from CHS 2.

On October 27, 2015, CHS 2 and Sherman met at Capitol Diner in

Harrisburg.  Sherman brought a black bag and a multicolored backpack, which

collectively contained approximately $277,000 in cash to the meeting, which he

then gave to CHS 2.  CHS 2 then notified his contacts in Mexico that the money

was picked up in Pennsylvania and would be delivered in a few days.  Law

enforcement officials traveled back to San Diego with CHS 2 and observed CHS 2

deliver the cash to the next courier after it was counted and put back in the bags in

which Sherman delivered it.  Law enforcement officials then followed that courier

until he met with another then-unidentified courier, who was given the bags of

cash.  Officers decided to conduct a traffic stop of the courier and the remaining

cash was seized as part of what was made to appear like a routine traffic stop.

Testimony at trial established that another cash transfer was made on

December 2, 2015.  For the second cash transfer, CHS 1 traveled to Harrisburg

with officers.  Sherman's phone number was again provided from the confidential

human sources' contacts in Mexico, as well as information that the money would

be from the same person at the same location.  Sherman arrived, got into the

vehicle driven by CHS 1, they counted the cash, and Sherman left.  The cash

totaled approximately $170,000, which was the amount mentioned during a phone call between CHS 1 and Sherman prior to the cash drop.

Law enforcement officials took the cash back to San Diego, where CHS 1 delivered the cash to another courier. Law enforcement officials utilized both officials on the ground to surveil the courier as well as an airplane with high-definition cameras. Officials on the ground followed the car on Interstate 5 until the car exited at the last exit allowing them to stay in the United States, before the San Ysidro port of entry into Mexico.

In an effort to gain the trust of their targets, on January 7, 2016, law enforcement officials sent CHS 2 to the casa de cambio in Tijuana, Mexico that was the subject of the investigation. CHS 2 testified that he met with Carlos Beltran ("Beltran"), who was running the DTO under investigation. CHS 2 discussed the cash that CHS 2 assisted in transporting back to Beltran. Additionally, according to CHS 2's testimony, the courier who was pulled over when the cash was seized was Beltran's brother-in-law, and Beltran did not blame CHS 2 for the seizure of the money. CHS 2 testified that Beltran was happy with his ability to help transport money from Pennsylvania into Mexico and wanted CHS 2 to start assisting with smuggling drugs from Mexico into the United States. CHS 2 also testified that Beltran discussed moving money in smaller amounts due to seizures.

The third cash transfer occurred on January 15, 2016.  CHS 2 met Sherman in Harrisburg and once again picked up cash.  The amount was approximately $107,000.  There was ground and aerial surveillance again when law enforcement officials took the cash back to San Diego to transport to another courier.  The courier was observed driving into Mexico with the cash.

Following the third cash transfer, CHS 2 again went to Tijuana to meet with Beltran.  According to the testimony of CHS 2, at this second meeting, Beltran explained several issues his DTO was having with their prior method of smuggling drugs into the United States and requested the assistance of CHS 2 to assist with smuggling methamphetamine and heroin to the individual he previously met with to get the cash, which CHS 2 understood to mean Sherman.

On April 26, 2016, the Orange County Regional Narcotics Suppression Program assisted federal investigators involved with a drug trafficking investigation.  Law enforcement officers involved in this investigation observed a transaction between a confidential source and the target, whose name was unknown at that time.  The transaction involved the confidential source delivering 2 kilograms of cocaine and 15,000 oxycodone pills to the target, who was driving a Chevy Silverado, in the parking lot of a Denny's restaurant in Linwood, California.  A surveillance unit observed the operation and relayed the vehicle information, including the license plate, to Detective Erick Peraza and Detective Raul Espinoza,

who were designated as the 'stop team'—the officers responsible for following the vehicle and initiating a pretextual traffic stop.

Soon after the transaction was observed, Detectives Peraza and Espinoza located the vehicle based on its description and began following it. They then observed the vehicle fail to stop at a red light. The detectives activated their lights and sirens and instructed the driver to continue off the exit and pull over. The vehicle pulled over, the driver produced his driver's license as requested by Detective Peraza, and was identified as Dwayne Sherman. Detective Peraza advised Sherman that he was going to get his citation book and issue Sherman a traffic citation.

Detective Peraza asked Sherman to give consent for his partner to search Sherman's vehicle and Sherman declined. At that point, Detective Peraza requested the K-9 unit. On the dog's second pass around the truck, it alerted to the presence of narcotics. The officers then searched Sherman's truck, seized 2 kilograms of cocaine and 10,000 to 15,000 blue pills with "M 30" stamped on them, and placed Sherman under arrest.

Paul Alston testified during the trial that he began purchasing cocaine from Sherman, who he knew as "Kalli," in about March of 2013 when they met at a barber shop in Lancaster. Alston testified that Sherman told him that the "Dominican guy" who Alston had been buying cocaine from was supplied by

Sherman.  Alston initially purchased ounce quantities of cocaine, but quickly

progressed to buying kilogram quantities from Sherman in the Summer of 2013.

Alston purchased one or two kilograms of cocaine from Sherman per week until

March of 2014 when Sherman found a tracking device on his vehicle and stopped

selling cocaine to Alston.  Alston agreed to cooperate with federal investigators in

2018 after he was federally indicted.  However, he was not cooperating in 2013

and 2014 when he was purchasing cocaine from Sherman.

### STANDARD OF REVIEW

In ruling on a motion for judgment of acquittal pursuant to Federal Rule of

Criminal Procedure 29, the court must "review the record in the light most

favorable to the prosecution to determine whether any rational trier of fact could

have found proof of guilt beyond a reasonable doubt based on the available

evidence." *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting

*United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).  The court must be

careful to find that evidence is insufficient only when "the prosecution's failure is

clear." *Id.* at 477.  In addition, the court must not usurp the jury's role "by

weighing credibility and assigning weight to the evidence, or by substituting its

judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir.

2005).

Pursuant to Rule 33(a), a court "may vacate any judgment and grant a new trial if the interest of justice so requires."  In contrast to the standard applied in reviewing a sufficiency of the evidence claim, "when a district court evaluates a Rule 33 motion, it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).  As a result, "even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted."  *United States v. Silveus*, 542 F.3d 993, 1004–05 (3d Cir. 2008).

## DISCUSSION

Sherman contends that the conspiracy counts should be vacated because they are outside the statute of limitations.  Sherman also argues that the evidence presented at trial was insufficient for any rational trier of fact to conclude that the Government proved beyond a reasonable doubt the essential elements of money laundering, conspiracy to commit money laundering, or conspiracy to distribute a controlled substance.  Alternatively, Sherman argues that he is entitled to a new trial because the jury's verdict was against the weight of the evidence.  Finally, Sherman continues his specific objections that were raised during his trial.  The court will address each of these arguments seriatim.

### A. Statute of Limitations

Sherman contends that the two conspiracy counts should be vacated because they are outside the statute of limitations.  (Doc. 150, p. 17.) [2]  Specifically, Sherman asserts that the cash transfers ended on January 15, 2016, and "those transfers were the only possible connection to the Beltran DTO."  (*Id.*)  He also asserts that there was no evidence of any drug trafficking in Pennsylvania past March of 2014.  (*Id.*)

In its brief in opposition to Sherman's motion, the Government argues that it proved that the conspiracies continued into the limitations period, Sherman participated in the conspiracies, and there was no evidence that Sherman discontinued his involvement in the conspiracies.  (Doc. 153, pp. 31–32.)  The Government also asserts that "the evidence supports the reasonable inference that Sherman's activities continued after the cash transactions, including but not limited to the kilograms of cocaine he was caught with on April 26, 2016, the numerous trips to Mexico in the spring of 2018, and the movement of cash through his bank accounts in 2017."  (*Id.* at 32.)  In reply, Sherman vigorously disputes the Government's assertions about what was proven at trial as it relates to the statute of limitations.  (Doc. 156, pp. 12–16.)

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

In the supplemental brief submitted by the Government in response to the court's order to address specific issues relating to Sherman's statute of limitations argument, the Government raised an additional argument.  The Government asserted that the statute of limitations is an affirmative defense that Sherman waived because he did not properly preserve the issue prior to or during trial. (Doc. 180, pp. 1–2.)  As a result, the Government asks the court to dismiss the statute of limitations challenges because they were waived without reaching the merits.  (*Id.* at 2.)  In his supplemental brief, filed after the Government's brief, Sherman did not respond to the waiver argument.  (*See* Doc. 181.)

The court will begin the discussion of Sherman's statute of limitations challenge by addressing the Government's waiver argument.  "[I]n criminal cases[,] the statute of limitations does not go to the jurisdiction of the court but is an affirmative defense that will be considered waived if not raised in the district court before or at trial."  *United States v. Ciavarella*, 716 F.3d 705, 733 (3d Cir. 2013) (citing *United States v. Karlin*, 785 F.2d 90, 92–93 (3d Cir. 1986)) (holding that because Ciavarella failed to request a jury instruction on the applicable statute of limitations, he failed to preserve the objection); *see also United States v. Botsvynyuk*, 552 F. App'x 178, 182 (3d Cir. 2014) (same).

Upon careful review of the record, Sherman did not raise a statute of limitations challenge to any count in his pretrial motions or briefs in support.  (*See*

Docs. 65, 66, 81, 82, 88.)  Sherman did not request a jury instruction on the statute

of limitations prior to trial, nor did he request an instruction during the charge

conference.  (*See* Docs. 124, 139, 140, 143; Doc. 165, pp. 278–309.)  Sherman did

not raise the issue during the pretrial conference or at any time during the trial.

(*See* Docs. 163–167.)  Indeed, Sherman has not asserted that he raised the issue

prior to or during trial.  Thus, it is clear that the first time Sherman raised a

challenge based on the statute of limitations was in his post-trial motion.  As a

result, the challenge is waived, and the court will not address the merits.

### B. Sufficiency of Evidence

#### 1. Money Laundering to Conceal Proceeds of Unlawful Activity

As to Counts 1, 3, and 5, the Government was required to prove: (1) the

defendant attempted to transport or transfer a monetary instrument or funds; (2) the

defendant's attempted transportation or transfer was from a place in the United

States to or through a place outside the United States; (3) the defendant knew that

the monetary instrument or funds involved in the transportation or transfer

represented the proceeds of some form of unlawful activity; and (4) the defendant

knew that the transportation or transfer was designed in whole or in part to conceal

or disguise the nature, location, source, ownership, or control of the proceeds of a

specified unlawful activity, specifically drug trafficking.  18 U.S.C.

§ 1956(a)(2)(B)(i).

Sherman argues that no reasonable juror would have found that these elements were proved beyond a reasonable doubt for the following reasons: (1) the money transferred was not concealed in any way and was counted in the parking lot during the transactions; (2) the Government did not provide any evidence to prove the nature or source of the funds; (3) there was no evidence of any drug transaction between Sherman, the courier, or his accomplices; (4) the Government did not provide any evidence that the purpose of Sherman transferring/transporting the money was to ensure secrecy rather than just to compensate the leaders of the operation or pay a debt; and (5) the Government did not produce any evidence to show Sherman had knowledge that his transfer was designed to conceal an ultimate plan to transfer the money to Mexico, as the confidential human sources and Sherman did not discuss any plan or the nature or source of the funds.  (Doc. 150, pp. 4–5.)

In response, the Government argues that Sherman's arguments are mainly aimed at the third and fourth elements—that the money was proceeds of an unlawful activity, that Sherman knew of this, and that Sherman knew that the transportation or transfer was designed to conceal or disguise the nature and source of the proceeds.  (Doc. 153, p. 13.)  As to whether the funds were proceeds, the Government contends that the circumstantial evidence at trial was sufficient that a reasonable juror could have found that the money Sherman transported was illegal

proceeds.  (*Id.* at 13–17.)  Specifically, the Government points to the fact that there was evidence that Sherman was a drug dealer selling drugs to Paul Alston from 2012 through 2014, and he was purchasing a large amount of cocaine to sell shortly after the cash transfers in 2016.  (*Id.* at 16.)  Additionally, tax and financial records produced at trial provide no legitimate explanation for Sherman to be in possession of over $500,000 in cash.  (*Id.*)  Finally, the Government points to the testimony from CHS 2 about his conversations with members of the Beltran DTO in Mexico, who explained that the cash payments they needed assistance collecting were related to drug trafficking.  (*Id.* at 16–17.)

As to the concealment element, the Government submits that Sherman's arguments miss the mark: the Government is only required to prove that the purpose of the transportation of the money was to conceal the nature, location, source, ownership, *or* control of the funds, not that the funds were themselves concealed.  (*Id.* at 17–22.)  On this point, the Government contends that legitimate business debts over $500,000 are not transacted in parking lots in cash between people who have never met.  (*Id.* at 20.)  Additionally, the Government asserts that a reasonable juror could infer from the circumstances that Sherman and his co-conspirators in Mexico were attempting to conceal their drug trafficking operation and payments for outstanding drug debts from investigative authorities, which is why they used cash that they smuggled into Mexico.  (*Id.*)

Finally, for both of these elements, the Government had to prove that Sherman had knowledge that the funds were unlawful proceeds and the purpose of the transportation of the proceeds.  Here, the Government argues that even if the jury were to believe Sherman's testimony that he received a call from his brother who asked him to meet an unknown person (identified at trial by Sherman as Rico) to obtain large sums of cash and then coordinate with another unknown person to transfer the cash, but that Sherman did not know what the funds were from or where they were going, the jury still could have found that he had the requisite intent because he was willfully blind to what was going on.  (*Id.* at 21.)  Therefore, the Government contends that Sherman's motion for a new trial on these counts should be denied.

In his reply brief, Sherman asserts that he is not, as stated by the Government, conceding the second element, that Sherman knew the transfers were going to a place outside the United States.  (Doc. 156, pp. 5–6.)  However, a plain reading of the statute demonstrates that the Government was only required to prove Sherman's knowledge as to the third and fourth elements.  *See* 18 U.S.C. § 1956(a)(2)(B)(i).  The second element only requires the Government to prove that the transfer was from a place in the United States to or through a place outside the United States.  At trial, there was testimony from Agent Salazar, Agent Duarte, and Ruben Martin (CHS 2) that the cash Sherman transported went into Mexico or

was destined for Mexico.  Therefore, there was sufficient evidence for a reasonable juror to find that the Government proved the first two elements.

On the issue of whether Sherman knew the money was proceeds from an unlawful activity, the court disagrees at the outset with Sherman's contention that the Government did not provide any evidence to prove the nature or source of the funds or Sherman's knowledge.  Ruben Martin (CHS 2) testified that the funds the Beltran DTO needed help picking up and bringing back into Mexico were drug trafficking proceeds.  (Doc. 164, p. 113.)  Additionally, the Government presented the testimony of Paul Alston that he was purchasing drugs from Sherman for a couple years, the testimony relating to Sherman's purchase of the two kilograms of cocaine in California in April of 2016, and Sherman's tax and financial records showing cash deposits with very little reported income.

As to the issue of Sherman's knowledge of the purpose for concealment, the court agrees with the Government's arguments about the focus of the element: the Government must prove that the purpose of the transportation of the funds was to conceal the nature, location, source, ownership, or control of the funds; the Government does not have to prove that the funds themselves were concealed. Thus, the court need not consider Sherman's argument that the money was not concealed and was counted in the parking lot during the transactions.

What remains of Sherman's argument on this element is his assertion that the Government did not provide any evidence that the purpose of Sherman transferring or transporting the money was to ensure secrecy rather than just to compensate the leaders of the operation or pay a debt.  Having reviewed the record, the court notes that there was testimony from Ruben Martin that during his meetings with Carlos Beltran, they discussed the fact that the money was from drug trafficking and that the DTO wanted Martin's continued assistance smuggling the money into the country.  They also discussed moving the money in smaller amounts to avoid law enforcement seizing large sums of cash.  Additionally, the uncontroverted facts in this case are that Sherman received a call from his brother in Mexico, requesting that he meet up with a person unknown to Sherman to obtain a large sum of cash and then give it to another person unknown to Sherman.  After Sherman transferred the money, it then went to at least one more courier before the money was transported to or toward Mexico.  These circumstances are sufficient for a reasonable jury to infer that the purpose of the transportation in this matter was to conceal the nature, location, source, ownership, or control of the funds.

Finally, the court turns to the element of Sherman's knowledge.  The court agrees with Sherman that there was no direct evidence at trial of his actual knowledge about the funds being proceeds of drug trafficking or the purpose of the transportation of the funds.  However, it is well established that "[k]nowledge

17

may be demonstrated by showing that a defendant either had actual knowledge or deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question." *United States v. Flores*, 454 F.3d 149, 155 (3d Cir. 2006). The Government can establish willful blindness "by proving that a defendant was objectively aware of the high probability of the fact in question and could have recognized the likelihood of illicit acts yet deliberately avoided learning the true facts." *Id.*

At trial, when asked on direct examination about how he became involved in the cash deliveries, Sherman testified as follows:

> Q: Can you tell us how you got involved in this cash delivery?
>
> A: My brother called me and asked me if I would take the cash to a guy that he is going to have call me and pick it up.
>
> Q: Did you ask him questions about where the money came from or why you had to do this?
>
> A: No, sir.
>
> Q: Why didn't you ask those questions?
>
> A: You just don't ask questions. I don't — it's not — if you start asking questions, then people start thinking you're telling and you're trying to set somebody up or —

(Doc. 166, p. 44.) Later during his direct examination, in response to the questions "[your brother] didn't tell you what the money was all about and you didn't ask?", Sherman answered "no, sir." (*Id.* at 47.)

Subsequently, during cross-examination, when asked by the Government about why he didn't ask questions of his brother and his knowledge of the source of the money, the following exchange occurred:

Q: When your brother called and asked you to do this, what did he say?

A: He said he needed me to drive some money from one point to meet up with somebody else.

Q: You said you didn't ask him any questions.

A: Nope.

Q: Why not?

A: Because there's no need to ask questions.

Q: And I think the word you said on direct examination was, you don't ask questions because people will think you're telling.

A: I did say that.

Q: And isn't that true from your experience dealing in drug trafficking, that you don't ask a lot of questions sometimes?

A: It's true from my experience growing up in neighborhoods that are impoverished, and, yes, they deal in drugs, yes, they have gangs. There's a lot of stuff that goes on in these neighborhoods, and you just don't ask questions.  You mind your business.

Q: Because if you ask questions, it makes it look like you're trying to gather information for the police?

A: It could be you're trying to gather information for the police, it could be you're trying to gather information to rob somebody.  There could be a number of explanations.

Q: So to make it clear, even talking to your own brother, you were afraid to even ask questions of him?

A: It's not that I'm afraid, it's just embedded.

Q: What did your brother do for a living?

A: I don't know what he did for a living.

Q: It seems like you visited him a lot in California.

A: In California or —

Q: I'm sorry, in Mexico

A: I mean, two, maybe four trips.  It's not really a lot.

Q: And you have no idea what your brother did to earn a living in Mexico?

A: It's none of my business what he does to earn a living, sir.

Q: But when he asked you to pick up a quarter million in cash, did that give you a signal of what he was doing for a living?

A: There is a number of crimes you could commit to make money, so if you're implying did I know he was selling drugs, no, I did not.

Q: But you did believe he was doing something criminal?

A: It is possible.

(*Id.* at 100–01.)

Later during cross-examination, when asked about whether he asked questions of "Rico," Sherman testified as follows:

Q: So on this occasion you meet Rico.  Right?

A: Yeah.

Q: And you decide it's not in your interest to ask any questions of Rico about this event, either?

20

A: It's not my business at all.

Q: If you ask questions of Rico, Rico may suspect that you're telling?

A: There would be no reason for me to ask questions of Rico.

(*Id.* at 103.)

Finally, and crucially, during a series of questions during cross-examination about the use of coded language during a phone call with the confidential human source, Sherman confirmed an awareness that the funds were most likely from criminal activity:

Q: Now, you meet the confidential human source in Harrisburg.  Is that right?

A: Yes.

Q: And you deliver all of this cash to him.  Right?

A: Correct.

Q: Did you say anything to him in that transfer about how much money there was there?

A: Yes, I believe we heard the conversation yesterday.

Q: Did you communicate with him in advance that it was going to be 277 titles?

A: I don't remember, but it's possible, yes.

Q: Well, why would you be using code words like "titles"?

A: I didn't use the word "title," he used the word "title."

Q: Why not just say 277,000 in cash?

A: Because you don't say that over the phone.

Q: Why?

A: Because it's not — the phones could be tapped, traced, whatever, so just don't talk like that on the phone.

Q: And the worry that it might be tapped or traced is because police would be looking at illegal activity.  Isn't that right?

A: Sir, yes, I already agreed to that, the money could be from illegal activity, yes.

Q: Would you agree that it would be likely from criminal activity?

A: Most likely, yes.

Q: And you know that most likely this money was criminal activity funds.  Right?

A: Yes, sir.

(*Id.* at 105–07.)

Sherman's own testimony establishes that he was objectively aware of the high probability that the funds were proceeds of criminal activity and deliberately avoided learning the true facts.  Thus, the court finds that a reasonable juror could have found that Sherman was willfully blind about the likelihood that the money he transported was proceeds from unlawful activity as well as the covert nature of the transportation of the funds using couriers as a favor to his brother in Mexico.  Reviewing the record in the light most favorable to the Government, as is required, the court concludes that any rational trier of fact could have found proof beyond a reasonable doubt on these three money laundering counts based on the available

22

evidence.  Therefore, Sherman's motion for judgment of acquittal on Counts 1, 3, and 5 will be denied.

### 2.  Money Laundering to Avoid Reporting Requirements

As to Counts 2, 4, and 6, the Government was required to prove: (1) the defendant attempted to transport or transfer a monetary instrument or funds; (2) the defendant's attempted transportation or transfer was from a place in the United States to or through a place outside the United States; (3) the defendant knew that the monetary instrument or funds involved in the transportation or transfer represented the proceeds of some form of unlawful activity; and (4) the defendant knew that the transportation or transfer of funds was designed in whole or in part to avoid a transaction reporting requirement under State or Federal law.  18 U.S.C. § 1956(a)(2)(B)(ii).

On these counts, Sherman argues that no reasonable juror could have found that these elements were proved beyond a reasonable doubt for the following reasons: (1) the Government did not prove any source for the funds transferred or that Sherman was aware of an illegal source as raised in the preceding argument; (2) the Government did not provide any evidence that Sherman broke any law involving any state or federal reporting requirement, and the statute does not consider violations of Mexican requirements, if any; (3) the mere transfer of money between two people does not itself generate a reporting requirement; (4) at

trial, the Government did not identify any specific reporting requirement violated by Sherman's actions; (5) there was no evidence from the IRS or any source that Sherman transferred the "proceeds of unlawful activity" through any United States or Mexican bank; (6) the Government did not produce evidence to prove Sherman knew that the purpose of handing the money to the informant was to avoid a reporting requirement; and (7) the Government did not establish that Sherman was required to put any of the money in a bank where it might be subject to regulation. (Doc. 150, pp. 6–7.)

In response, the Government argues that there was testimony that those who carry $10,000 or more in cash across the border are required to file a report, and deposits of $10,000 or more in cash into the banking system in the United States require similar reporting. (Doc. 153, p. 23.) Additionally, the Government points to the testimony from law enforcement witnesses about the pervasiveness of smuggling cash into Mexico and their investigations and task forces focusing on such activities. (*Id.* at 24.) The Government highlights this testimony, as well as Ruben Martin's testimony about his involvement with DTOs in arguing that avoiding federal and state financial reporting requirements is a necessary part of the international drug trafficking business, and that a jury could infer that Sherman and his cohorts were trying to avoid such requirements. (*Id.*) Therefore, the

Government contends that Sherman's motion for a new trial on these counts should be denied.

Notwithstanding the arguments presented regarding the sufficiency of the evidence regarding the money laundering counts, the court ordered the parties to address the authority in *United States v. Navarro*, 145 F.3d 580 (3d Cir. 1998), as well as persuasive authority from other Circuit Courts, as to whether subsections (a)(2)(B)(i) and (a)(2)(B)(ii) of 18 U.S.C. § 1956 are separate offenses or separate means of committing a single offense.  (Doc. 176, pp. 2–3, n.2.)  Because the court has determined that the convictions at Counts 1, 3, and 5 will not be vacated, this "separate means" issue is potentially dispositive with respect to Counts 2, 4, and 6. As a result, the court will address this issue before addressing the sufficiency of the evidence as to these counts.

In *Navarro*, the defendants were charged in the conjunctive with promotion, concealment, and avoidance of reporting requirements in the context of 18 U.S.C. § 1956(a)(1)(B)(i) and (ii).  145 F.3d at 582.  The Third Circuit addressed defendants' argument on appeal that an unanimity instruction was necessary with respect to the alternative mental states defined in 18 U.S.C. § 1956 under the plain error standard of review.  *Id.* at 585–92.  The defendants argued that the alternative mental states in the statute constitute separate offenses, whereas the Government argued that they are separate means of committing a single offense.  *Id.* at 585–86.

The *Navarro* court concluded that "the application of the *Schad-Edmonds* test to

[18 U.S.C. § 1956] yields the conclusion that it is neither clear nor obvious that the

three alternative mental states defined in § 1956 could not properly be treated as

separate means of committing a single offense." *Id.* at 592.  The court noted that it

found "especially persuasive the reasoning in [*United States v. Holmes,* 44 F.3d

1150 (2d Cir. 1995),] that the point of the money laundering statute is to punish a

financial transaction involving known illicit proceeds, accomplished for a guilty

purpose.  That multiple purposes could satisfy this end does not mean that

Congress intended to create multiple offenses." *Id.*  However, the court noted that

a footnote in an earlier decision cast some doubt on this conclusion, and thus left

"to another day (or to the en banc court) the task of definitive interpretation." *Id.*

   After noting that *Navarro* can be differentiated from this case for at least two

reasons, the Government observed that the reasoning in *Navarro* has been followed

by two other Circuits, and other Circuits have reached the same conclusion without

the depth of analysis provided in *Navarro*.  (Doc. 180, p. 15 (citing *United States v.*

*Seher*, 562 F.3d 1344 (11th Cir. 2009); *United States v. Booth*, 309 F.3d 566 (9th

Cir. 2002); *United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003); *United States v.*

*Garcia-Torres*, 341 F.3d 61 (1st Cir. 2003); and *United States v. Holmes*, 44 F.3d

1150 (2d Cir. 1995).)  Sherman takes the position that the subsections are separate

means of committing a single offense based on *Navarro*.  (Doc. 181, p. 12.)

Based on the exhaustive analysis set forth in *Navarro*, as well as the persuasive authority from five other Circuits, the court concludes that subsections (a)(2)(B)(i) and (a)(2)(B)(ii) of 18 U.S.C. § 1956 are separate means of committing a single offense.  In light of this conclusion, the parties agree that the court should impose a single punishment on the pairs of offenses that each arise from a single transaction.  (*See* Doc. 180, p. 15 (citing *Ball v. United States*, 470 U.S. 856 (1985); Doc. 181, p. 12.)  Accordingly, the court will vacate Sherman's convictions for Counts 2, 4, and 6.

### 3.  Drug Trafficking Conspiracy

Sherman argues that the evidence at trial was insufficient to prove him guilty of a drug trafficking conspiracy.  (Doc. 150, pp. 7–10.)  Sherman focuses his argument on the lack of direct evidence that Sherman conspired specifically with any particular Mexican drug trafficking organization, cartel, or Paul Alston.  (*Id.*)  Relatedly, Sherman argues that the Government's evidence showed three separate categories of activities—selling drugs to Alston, picking up drugs in California, and delivering large amounts of cash to confidential human sources— but did not prove a link between these categories.  (*Id.*)  Finally, Sherman asserts that certain discrete facts were not proven beyond a reasonable doubt at trial.  (*Id.* at 8–9.)

The Government counters by asserting that Sherman's argument is a "divide and conquer" strategy that focuses on isolated facts and challenges the inferences

that could or could not be drawn from such facts, but ignores the totality of the evidence.  (Doc. 153, pp. 26–29.)  The Government argues that when the trial evidence is viewed in totality, the evidence was sufficient to conclude that Sherman was clearly involved in a drug trafficking conspiracy.  (*Id.* at 28–29.)

To prove a conspiracy, the Government was required to show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal.  *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2013) (citing *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010)).  The Government may prove these elements with either direct or circumstantial evidence.  *Id.* (citing *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005)).

Although it is true that the Government did not necessarily "connect the dots" between the categories of activities referenced by Sherman, that was not necessary given how the drug trafficking conspiracy was charged and the Government's presentation of evidence on this charge.

Specifically, Count 7 of the second superseding indictment charged Sherman with conspiracy to distribute and possess with intent to distribute 500 grams and more of cocaine between "on or about 2012 to in or about May 2018" in the Middle District of Pennsylvania, the Eastern District of Pennsylvania, the Middle District of California, the Southern District of California, and elsewhere, in

28

violation of 21 U.S.C. § 846. (Doc. 116, p. 7.) Sherman was accused of participating in a drug trafficking conspiracy with "other persons known and unknown to the Grand Jury" and he was the sole defendant named in the second superseding indictment. (*Id.*) There is no reference in Count 7 of the second superseding indictment to Paul Alston, a Mexican drug trafficking organization, or a cartel.

In the brief in opposition to Sherman's post-trial motion, the Government summarized its presentation of evidence on this count as follows:

> Sherman was clearly involved in a drug conspiracy, which may have had different participants enter and leave over time, i.e. Paul Alston. It clearly continued over years and involved Sherman trafficking drugs acquired from sources in Mexico. The exact contours of the conspiracy, the specific participants at any given time, and the participants['] roles at any given time are not facts necessary for a jury to conclude guilt. What is necessary for conviction is sufficient proof that Sherman entered into an agreement with someone else to traffic drugs. There was more than sufficient evidence to conclude that he did. Indeed his own testimony established that he did.

(Doc. 153, pp. 28–29.) This is consistent with the overview provided by the Government in closing argument:

> What we have here with Mr. Sherman is a large cocaine trafficker from Lancaster, Pennsylvania . . . . Almost by the necessity of the size and scope of what he was up to requires working with other people and requires working with other people to have customers, to have places to hide your stuff, places to conceal your stuff, to pick up the drugs, to have the drugs imported and shipped to you, to have cash, to have whatever instruments you need to protect your operation. It necessarily involves other people.

> And in the course of this investigation, the government found insights
> into this world and insights into this life and this operation of the
> defendant and in furtherance of his drug trafficking conspiracy.  That's
> what an operation is, a group of people working together.  He was
> delivering cash, he was picking up kilos, he was using lidocaine powder
> for cutting agents, he was crossing the border into Mexico, he was
> getting traps put in his cars in furtherance of all of it.  This was his
> operation with others.  Very straightforward.

(Doc. 167, p. 12.)  The Government did not attempt to "connect the dots" to prove

exactly who Sherman conspired with throughout the conspiracy, instead relying on

the evidence proving that he conspired with "other people" generally to sell drugs.

(*See, e.g., id.* at 29, 60–61.)

After reviewing the record in the light most favorable to the Government,

the court concludes that, based on the totality of the evidence presented at trial, any

rational trier of fact could have found proof of guilt beyond a reasonable doubt

based on the evidence that Sherman was involved in a drug trafficking conspiracy

with other people who shared a unity of purpose to traffic cocaine, an intent to

achieve that common illegal goal, and an agreement to work toward that goal as

demonstrated by their conduct.  Therefore, Sherman's motion for judgment of

acquittal on Count 7 will be denied.

### 4.  Money Laundering Conspiracy

Sherman argues that the evidence at trial was insufficient to prove him guilty

of a money laundering conspiracy.  (Doc. 150, pp. 10–14.)  Sherman incorporates

his arguments regarding the insufficiency of the evidence with respect to the

individual money laundering counts, and once again asserts that no reasonable juror could infer that Sherman conspired to launder money with the Beltran drug trafficking organization. (*Id.*) Sherman also details instances in which the Government did not prove Sherman's knowledge of specific events, inconsistent evidence, or evidence that does not tend to prove that a money laundering conspiracy existed or that Sherman participated in it. (*Id.*) Finally, Sherman argues that the Government failed to prove that a conspiracy existed "between Dwayne Sherman and anyone but the informant and the person who gave him the money" and also failed to prove that the conspiracy was still ongoing after January 15, 2016. (*Id.* at 14.)

The Government responded by incorporating their argument regarding the sufficiency of the evidence on the substantive money laundering counts, and asserting that the challenge to the money laundering conspiracy conviction is without merit. (Doc. 153, p. 29.)

The elements of a money laundering conspiracy, pursuant to 18 U.S.C. § 1956(h), are: "(1) that an agreement was formed between two or more persons [to commit the offense of money laundering]; and (2) that the defendant knowingly became a member of the conspiracy." *United Sates v. Greenidge*, 495 F.3d 85, 100 (3d Cir. 2007). The court will not repeat the analysis set forth above regarding substantive money laundering counts. However, the court notes that the above

discussion regarding the substantive counts largely resolves Sherman's argument regarding the money laundering conspiracy.

In addition, the court notes that Count 8 of the second superseding indictment accuses Sherman of conspiring with "other persons known and unknown to the Grand Jury" to commit the offense of money laundering between on or about October 2015 to in or about May 2018, in the Middle District of Pennsylvania, the Eastern District of Pennsylvania, the Southern District of California, and elsewhere.  (Doc. 116, p. 8.)  The Government neither charged nor attempted to prove that Sherman conspired with the Beltran DTO or any other specific person to launder money.  Instead, the Government alleged and presented evidence at trial to establish that Sherman conspired with others (not limited to Government agents or informants) to launder money in order to conceal drug trafficking proceeds.

After reviewing the record in the light most favorable to the Government, the court concludes that, based on the totality of the evidence presented at trial, any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the evidence that Sherman was involved in a money laundering conspiracy.  Therefore, Sherman's motion for judgment of acquittal on Count 8 will be denied.

### C. Weight of Evidence

Sherman argues that the court should consider his arguments regarding insufficient evidence and order a new trial in the interest of justice pursuant to Federal Rule of Criminal Procedure 33(a).  (Doc. 150, pp. 14–16.)  The Government did not respond to this argument.

Sherman largely references the arguments the court has already rejected in support of his request for a new trial.  The only new argument raised is that Paul Alston was not a credible witness.  (*Id.* at 15–16.)  The court does not agree.  A key indicator that Paul Alston testified truthfully with respect to Sherman being a source of large quantities of cocaine was his testimony that Sherman told him in 2014 that he found a tracking device on his vehicle. (Doc. 155, p. 24.)  This fact was confirmed by Sherman through his counsel's questioning of Paul Alston.  (*Id.*)  It is difficult to imagine how Paul Alston could have known this fact unless he was, in fact, purchasing drugs from Sherman in 2014 when Sherman decided to stop his activities due to finding the tracking device.

In any event, the court can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Silveus*, 542 F.3d at 1004–05.  Having reviewed Sherman's arguments and the trial record, the court does not believe that the jury's

verdict is a miscarriage of justice.  As a result, Sherman's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33(a) will be denied.

### D. Objections at Trial

Sherman continues his objections raised at trial, including venue entrapment and objections relating to jury instructions.

#### 1. Venue Entrapment

Following the close of the Government's case-in-chief, counsel for Sherman moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  (Doc. 165, pp. 270–272.)  At the close of his argument, counsel raised an issue of venue entrapment, arguing that the agents and confidential human sources brought Sherman into the Middle District of Pennsylvania when he was not otherwise planning to travel into the district.  (*Id.* at 272.)  In response, the Government argued that the defense had not presented legal authority as to what would constitute venue entrapment.  (*Id.* at 276.)  Because no legal authority had been presented on venue entrapment and because the testimony established that the informants proposed a meeting location in Harrisburg that Sherman agreed to, the court denied Sherman's motion for judgment of acquittal on this basis.  (*Id.* at 277.)

In the instant motion, Sherman once again raises the issue of venue entrapment.  Sherman argues that the evidence at trial showed that the informant

lured Sherman into the Middle District of Pennsylvania for the cash transfer even though the other criminal activity alleged against him occurred in Lancaster in the Eastern District of Pennsylvania.  (Doc. 150, pp. 16–17.)  Sherman also asserts that there is no evidence of any drug trafficking in the Middle District of Pennsylvania at all.  (*Id.* at 17.)

In response, the Government notes that there is a specific venue statute for money laundering, examination of which confirms that venue lies in this district because the cash transactions took place in this district.  (Doc. 153, p. 30.) Additionally, the Government argues that the Third Circuit has not recognized a venue entrapment claim, and other circuits that have considered venue entrapment have rejected it.  (*Id.* at 30–31.)

In his reply brief, Sherman asserts that the Government cannot make a credible or legitimate argument that Sherman was not lured to the Middle District of Pennsylvania by the confidential human sources.  (Doc. 156, p. 11.) Additionally, Sherman repeats that all of his activities were in Lancaster and that there is no evidence he ever did anything in Harrisburg.  (*Id.*)  Sherman contends that there was no reason for him to be in the Middle District of Pennsylvania except for the confidential human source saying that he wanted the money to be delivered to Harrisburg, and that such purposeful venue misconduct should not be rewarded.  (*Id.* at 11–12.)

However, once again, Sherman has not provided any authority to support his position that he is entitled to a judgment of acquittal on this basis. Sherman has provided no binding or even persuasive authority supporting the notion that venue entrapment is a basis for granting judgment of acquittal. Therefore, the court need not make a determination as to whether or not Sherman was in fact "lured" to the Middle District of Pennsylvania by law enforcement authorities and the confidential human sources. Sherman's motion for judgment of acquittal on the basis of venue entrapment will be denied.

### 2. Bulk Cash Smuggling Jury Instruction

Sherman also continues his objection to the court's refusal to give the requested bulk cash smuggling jury charge. (Doc. 150.) The Government argues that for the reasons identified by the court at trial, the jury was properly instructed. (Doc. 153, p. 32.) During the trial, counsel for Sherman stated in his opening statement that Sherman was charged with money laundering, which was different from "handing over cash" and that the jury would be permitted to consider a separate charge of transferring bulk cash. (Doc. 163, pp. 47–48.) On the second day of trial, while court was in recess, the Government indicated that it was looking into whether bulk cash smuggling was a lesser included offense of any of the charged offenses. (Doc. 164, p. 8.)

On the third day of trial, prior to the commencement of proceedings, Sherman submitted a proposed jury instruction for bulk cash smuggling. (Doc. 139.) During the charge conference, counsel for Sherman asserted that bulk cash transfer, 31 U.S.C. § 5332(a)(1), is a lesser included offense of money laundering and requested that the bulk cash transfer jury instruction be included. (Doc. 165, p. 292.) The court identified the threshold inquiry as whether bulk cash transfer is a lesser included offense of either of the money laundering violations charged in the indictment. (*Id.* at 293.) Relying on Supreme Court case law provided by counsel, the court found the required elements of the bulk cash smuggling criminal provision in § 5332 to be a defendant who knowingly conceals more than $10,000 in currency, which could be lawful proceeds because there is no requirement that the proceeds be unlawful, could be found guilty of that offense. (*Id.* at 299.) The court noted that the first element for bulk cash smuggling also included a requirement that the amount exceed $10,000 in currency, and the cash must be on the person of such individual, or in any conveyance, article of luggage, merchandise, or other container. (*Id.*) The court concluded that those elements are different than the elements of the money laundering statute. (*Id.*)

Furthermore, the court identified a different intent requirement between the two statutes, as the bulk cash smuggling statute requires specific intent whereas the money laundering statute contains a knowing element. (*Id.* at 299–300.) While

not making a final determination at the charge conference, the court also noted that the Supreme Court examined the two statutes and determined that they targeted distinct conduct.  (*Id.* at 301.)

The following morning, before the jury entered the courtroom and trial commenced, the court heard additional argument from both parties and ultimately concluded that under the test set forth in *Schmuck v. United States*, 489 U.S. 705 (1989), because the bulk cash smuggling statute, § 5332(a)(1), requires an element not required for the greater offense, which is the money laundering statute, § 1956(a)(2)(B)(i) or (ii), it was not a lesser-included offense.  (Doc. 166, pp. 7– 11.)

The Supreme Court has set forth the test for when an offense is a lesser-included offense: "one offense is not necessarily included in another unless the elements of the lesser offense are a subset of the elements of the charged offense." *Schmuck*, 489 U.S. at 716.  Furthermore, the Court stated that "[w]here the lesser offense requires an element not required for the greater offense, no instruction is to be given under [Federal Rule of Criminal Procedure] Rule 31(c)."  *Id.*

The Supreme Court has specifically compared the bulk cash smuggling statute and the money laundering statute.  *See Regalado Cuellar v. United States*, 553 U.S. 550 (2008).  In undertaking this comparison, the court observed:

> To be sure, certain conduct may fall within both statutes.  For example, both provisions may be violated by a defendant who intends to evade a

> relevant reporting requirement.  *See* [31 U.S.C. 5332(a)(1) (transportation of funds "with the intent to evade a currency reporting requirement"); 18 U.S.C. § 1956(a)(2)(B)(ii) (transportation of funds knowing that it is designed "to avoid a transaction reporting requirement").  But only the money laundering statute may be violated in the absence of such intent.  *See* § 1956(a)(2)(B)(i) (prohibiting transportation of illicit funds knowing that the transportation is designed to conceal or disguise a listed attribute).  Similarly, although both statutes encompass transportation of illicit funds, only the bulk cash smuggling statute also punishes the mere transportation of lawfully derived proceeds. *Compare* 31 U.S.C. § 5332(a) (omitting any requirement that the funds be unlawfully derived) with 18 U.S.C. § 1956(a)(2)(B) (requiring that the defendant "kno[w] that the monetary instrument or funds involved in the transportation . . . represent the proceeds of some form of unlawful activity").

*Id.* at 560–61.  However, this observation was provided after the Court unequivocally concluded that despite some overlap between the statutes, "the two statutes nonetheless target distinct conduct."  *Id.* at 560.

Although the question before the Supreme Court in *Cuellar* was not whether bulk cash smuggling was a lesser-included offense of money laundering, the Court concluded that the statutes target distinct conduct and analyzed elements in the bulk cash smuggling statute that are not elements of money laundering.  Therefore, consistent with this court's prior ruling during trial, the court now concludes that bulk cash smuggling is not a lesser-included offense of money laundering and the inclusion of the instruction was not permitted under Federal Rule of Criminal Procedure 31(c).  This aspect of Sherman's motion will be denied.

### 3. *Sears* Charge

Prior to the last day of the trial, counsel for Sherman submitted a proposed jury instruction requesting a *Sears*[3] instruction be given.  (Doc. 143.)  On the morning of the last day of the trial, the court discussed the additional instruction with counsel.  (Doc. 167, pp. 3–6.)  While the Government did not oppose the instruction, the court indicated that the evidence presented at trial did not warrant giving the instruction to the jury.  (*Id.* at 3.)  Specifically, the court pointed to Sherman's own testimony that there were individuals aside from the confidential human sources who were involved in the conduct at issue, and therefore concluded that the instruction was not supported by the record and was not warranted.  (*Id.* at 6.)

In the instant motion, Sherman continues his objection to the court's refusal to give the requested *Sears* charge to the jury.  (Doc. 150, p. 17.)  The Government again argues that for the reasons identified by the court at trial, the jury was properly instructed.  (Doc. 153, p. 32.)  Sherman has presented no new arguments and has pointed to no evidence in the record that would change the court's original analysis.  As to the cash transfers, in addition to getting a phone call from his

---

[3] Pursuant to *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965), Sherman requested that the court instruct the jury that an individual must conspire with at least one co-conspirator and that there can be no conspiracy when the only person with whom the defendant allegedly conspired was a government agent or informant who secretly intended to frustrate the conspiracy.

brother to initiate the cash transfers, Sherman testified that he got the money from an individual named Rico. There was no testimony that Sherman's brother or Rico were government agents or informants. Additionally, there was no evidence that the subsequent couriers were government agents. As to prior drug trafficking activity, Paul Alston testified that Sherman sold him cocaine for several years. Although Alston began cooperating with the United States in 2018, there was no testimony that he was a government agent or informant during the time when he purchased cocaine from Sherman in 2013 and 2014. Finally, as to the purchase of controlled substances in California, Sherman testified that Sam Pena and at least one other unnamed individual were involved. Therefore, the court's analysis remains unchanged — the evidence of record did not support giving the instruction to the jury, as it was clear that there were alleged co-conspirators involved who were not government agents or informants. This aspect of Sherman's motion will likewise be denied.

## CONCLUSION

Because the court concludes that sufficient evidence supports the jury's verdict and that the verdict was not against the weight of the evidence, the court will deny Sherman's post-trial motion.  However, because the court concludes that the pairs of substantive money laundering counts constitute separate means of committing a single offense, the court will vacate Sherman's convictions at Counts 2, 4, and 6.

A separate order will follow.


s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: August 11, 2023